## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **DOROTHY A. SMULLEY,** | CIVIL ACTION 3:14cv997(JAM) |
| Plaintiff, | |
| v. | |
| MUTUAL OF OMAHA BANK (REMOVED); ERIN BOWEN aka ERIN KREMSER, ERIN ALICATA (REMOVED); **WEBSTER FINANCIAL CORPORATION dba WEBSTER BANK;** ZELDES NEEDLE & COOPER PC (REMOVED); IMAGINEERS, LLC (REMOVED); ORONOQUE SHORES CONDOMINIUM ASSOCIATION NO. 1 INC. (REMOVED); **JPMORGAN CHASE BANK, NATIONAL ASSOCIATION; FEDERAL HOUSING FINANCE AGENCY; FEDERAL NATIONAL MORTGAGE ASSOCIATION; and MORTGAGE ELECTRONIC REGISTRATION SYSTEMS INC.,** | JURY TRIAL DEMANDED JULY 6, 2016 |
| Defendants. | |

## FIRST AMENDED COMPLAINT

Plaintiff Dorothy A Smulley files her First Amended Complaint (FAC) as follows.

## Table of Contents

                                                                    **Pages**
The Parties. . . . . .. . . 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2 - 3

Jurisdiction and Venue. . . . . .  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

Undisputed Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5 - 13

### Smulley v Webster
Count 1, Tortious interference with statutory and contractual obligations. . . .  14 - 15

Count 2, WITHDRAWN (by plaintiff). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15
Count 3, WITHDRAWN (by plaintiff). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

Count 4, Breach of implied covenant of good faith and fair dealing. . . . . . . . .  15 - 16

Count 5, Unfair trade practices (CUPTA). . . . . . . . . . . . . . . . . . . . . . . . . . . .  16 - 18

Count 6, WITHDRAWN (by plaintiff) REPLED AS COUNT 19. . . . . . . . . . . . .  18

Count 7, False light invasion of privacy. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18 - 19

Count 8, Negligent infliction of emotional distress. . . . . . . . . . . . . . . . . . . . . .  20 - 21

Count 9, Intentional infliction of emotional distress. . . . . . . . . . . . . . . . . . . . .  21

Count 10, WITHDRAWN (by plaintiff) REPLED AS COUNT 19. . . . . . . . . . . .21
Count 11, WITHDRAWN (by plaintiff). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21
Count 12, WITHDRAWN (by plaintiff). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

### Smulley v MERS
Count 13, Unfair trade practices (CUPTA). . . . . . . . . . . . . . . . . . . . . . . . . . .  22 - 23

### Smulley v Chase
Count 14, Breach of contract - third party beneficiary. . . . . . . . . . . . . . . . . . .24 - 26
Count 15, Breach of implied covenant of good faith and fair dealing. . . . . . . .  26 - 27
Count 16, Unfair trade practices (CUPTA). . . . . . . . . . . . . . . . . . . . . . . . . . .  27 - 30
Count 17, False light invasion of privacy. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30 - 31

### Smulley v Fannie Mae; FHFA
Count 18, Vicarious liability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32 - 34

### Smulley v Webster, MERS, Chase, Fannie Mae, FHFA
Count 19, Civil Racketeer Influenced Corrupt Organization (RICO). . . . . . . . .35 - 49

Relief. . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . .  50

Certification. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . 51

## Exhibits

Multistate Condominium Rider-Single Family-Fannie Mae/Freddie Mac
Uniform Instrument Form 3140. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1 - 2

## THE PARTIES

1.      Plaintiff, Dorothy A Smulley (plaintiff), is an individual and, since 1984, owner and resident of a single family residence located at 408 Bar Harbour Road, Stratford, Connecticut (real property).  Plaintiff is a member of a Connecticut common interest ownership association known as Oronoque Shores Condominium Association No. 1 Inc.., (Oronoque), where her real property is located.  Plaintiff is statutorily obligated to Oronoque pursuant to Connecticut General Statutes  § 47-200 *et al (CIOA)* and contractually obligated pursuant to Oronoque's Declaration and Bylaws in her timely payment of common charge assessments.

2.      Defendant Webster Financial Corporation is a financial holding company existing for the purpose of ownership of all outstanding capital stock of Webster Bank, National Association (Webster).  Webster is registered in the state of Delaware and a federally insured depository institution organized under the laws of the United States. Webster is authorized to conduct business in Connecticut and maintains a place of business at 145 Bank Street, Waterbury, Connecticut.  At all relevant times, Webster maintained two or more bank accounts for Oronoque and served as a depository for Oronoque's members' payment of their common charge assessments.  Webster also served as plaintiff's mortgage lender commencing 2004.

3.      Defendant JPMorgan Chase Bank, National Association (Chase) is the successor entity to Chase Bank NA.  Chase is registered in the state of Delaware and engaged in the business of consumer lending and servicing, among other business activities, and maintains a primary business address at 1111 Polaris Parkway, Columbus, Ohio.  Chase is plaintiff's mortgage servicer since 2004.

2

4.     Defendant Federal Housing Finance Agency (FHFA) is a federal agency located at 400 7th Street SW Washington DC. FHFA was created on July 30, 2008, pursuant to the Housing and Economic Recovery Act of 2008 (HERA) to oversee Federal National Mortgage Association (Fannie Mae), among other entities. On September 6, 2008, under HERA, the Director of FHFA placed Fannie Mae, among others, into conservatorship and appointed FHFA as conservator. In the capacity of conservator, FHFA has the authority to exercise all rights and remedies of the Government Sponsored Entities (GSE) including but not limited to, the authority to defend suits against Fannie Mae. 12 USC § 4617(b)(2).

5.     Defendant Federal National Mortgage Association (Fannie Mae) is a GSE chartered by Congress with a mission to provide liquidity, stability and affordability to the United States housing and mortgage markets. As part of this mission, Fannie Mae invested in residential mortgage-backed securities . Fannie Mae is located at 3900 Wisconsin Avenue NW in Washington DC. Sometime during 2004 after Webster became plaintiff's mortgage lender, Webster purportedly transferred its beneficial interest in plaintiff's mortgage note to Fannie Mae.

6.     Defendant Mortgage Electronic Registration Systems, Inc.. (MERS) is a members-only, private-for-profit company which operates an electronic registry system to track servicing and beneficial interests for members only. MERS may also act as nominee for members only. MERS is registered in Delaware and maintains a primary address at 1818 Library Street #300 in Reston, Virginia. Upon information and belief, at all times relevant MERS acted as nominee for Webster only.

3

## JURISDICTION AND VENUE

7.      This court has subject matter jurisdiction under 18 USC § 1964(a) and (c) of the Racketeer Influenced and Corrupt Organization Act and pursuant to 28 USC § 1331, both of which confers original jurisdiction upon this court in a civil action arising under federal law.

8.      This court has personal jurisdiction over all defendants pursuant to the Racketeer Influenced and Corrupt Organization Act, 18 USC § 1965.

9.      This court has subject matter jurisdiction pursuant to 28 USC § 1332 because diversity exists among the parties, the amount in controversy meets or exceeds $75,000 and the court's supplemental jurisdiction pursuant to 28 USC § 1367 over all other claims which are related to the original jurisdiction

10.     The court has jurisdiction over this action pursuant to 28 USC § 1346 which confers original jurisdiction over claims brought against FHFA in its capacity as conservator of Fannie Mae pursuant to 12 USC § 4617(b)(2).

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2) because the events giving rise of plaintiff's claims occurred in this District.

12.     Jurisdiction for declaratory and other relief is invoked pursuant to 28 U.S.C. §§ 2201 and 2202.

4

## UNDISPUTED FACTS

13.    Pursuant to plaintiff's membership requirements in Oronoque, plaintiff is statutorily obligated to Oronoque to make timely payments of her common charge assessments in compliance with, *inter alia,* §§ 47-76(b) and 47-257(b) of Connecticut General Statutes. Plaintiff is contractually obligated to Oronoque in the same regard to comply with Article 15 and Section 11 of Oronoque's Declaration and Bylaws.

14.    Oronoque employs a property management company, Imagineers, LLC (Imagineers) a nondefendant [1], to collect and deposit plaintiff's and other members' payments of common charge assessments and to provide a monthly accounting of such collection and deposits to Oronoque.

15.    Plaintiff made monthly payments of her of common charge assessments in a timely manner and did so through online payment services of her bank which, each month, issued a bank check payable to Oronoque and mailed in care of Imagineers, who then credited plaintiff's Oronoque account established for the specific purpose.

16.    Sometime around March, 2004, plaintiff refinanced her real property. Webster acted as mortgage lender and MERS as Webster's nominee. Plaintiff's mortgage note was collateralized by a mortgage on her real property which mortgage was recorded on the land records. As a condition precedent to Webster providing the financing, Webster required plaintiff to sign Multistate Condominium Rider-Single Family-Fannie Mae Freddie Mac Uniform Instrument Form 3140 (Form 3140) (E1-2) [2].

---

[1]  Plaintiff withdrew her action against Imagineers by agreement reached January 5, 2016. Other nondefendants by agreement include Zeldes Needle & Cooper PC, Mutual of Omaha Bank, Erin Bowen aka Erin Kremser, Erin Alicata and Oronoque.

[2]  Exhibits and page numbers will be cited as (E___).

5

17.     For the first time commencing October 28, 2011, and continuing through April 20, 2012, plaintiff received a series of letters from nondefendant Zeldes Needle & Cooper PC (ZNC), a law firm employed by Oronoque, which asserted unspecified violations of Oronoque's Declaration and Bylaws.

18.     After receipt of the first letter and commencing November 4, 2011, and continuing through April 30, 2012, plaintiff made repeated requests to ZNC for specific disclosure of the purported violations.  However, ZNC failed to disclose.

19.     On or around April 30, 2012, plaintiff received an invoice from Imagineers in which a fine was levied against plaintiff for $9,738.32 and identified only as *"unauthorized Addtns/alteration"*.

20.     As a result of the unlawful fine and failures to disclose, plaintiff filed a lawsuit in state court on June 15, 2012 [3], against Imagineers, Jennifer L Feiman (Feiman), a property manager in the employment of Imagineers, ZNC, and ZNC's attorneys, Robert A Pacelli, Jr. (Pacelli), and Joseph Cessario (Cessario).

21.     Commencing on or around July 12, 2012, and continuing monthly thereafter, plaintiff's payments of her common charge assessments mailed to Imagineers, were returned by ZNC without deposit or credit to her Oronoque account. The letters, signed by Pacelli, demanded reissuance payable to ZNC and demanded payment of $10,705.39 for the unlawful fine under threats of foreclosure and other legal action.

---

[3]   *Smulley, v Imagineers, et al*, FBT-CV12-5029794-S, Conn. Superior Court.

22.    As a result and because of plaintiff's statutory and contractual obligations, commencing with the first returned check for July, 2012, and continuing through May, 2013, plaintiff promptly deposited her returned checks into Oronoque's bank account maintained with Webster which deposits Webster readily and willingly accepted.

23.    On August 8, 2012, Oronoque [4] filed an injunctive action against plaintiff in state court [5] which alleged violations of Oronoque's Declaration and Bylaws upon which the fine of $9,738.32 was levied.

24.    On November 19, 2012, Oronoque filed a foreclosure action against plaintiff in state court [6] which alleged nonpayment of common charge assessments of $11,305.12.

25.    At the time of the foreclosure action, Oronoque knew plaintiff was current in her payment of common charge assessments and the allegations of nonpayment were false and misleading and were, in fact, based upon the fine of $9,738.32 previously levied and included $1,566.80 for prejudgment interest and attorneys fees [7].

26.    Oronoque also named MERS as nominee for Webster as a defendant in the foreclosure lawsuit based upon the land records.

---

[4]  For purposes of clarity, any reference to Oronoque also infers reference to Imagineers, ZNC and any and all individuals named in the state court actions.

[5]  *Oronoque Shores v Smulley,* FBT-CV12-6029505-S, Conn. Superior Court.  On September 28, 2012, after a  three-day hearing on the merits, Oronoque's injunction was denied on grounds of failure to make a prima facie case.

[6]  *Oronoque Shores v Smulley, et al,* FBT-CV12-6031532-S, Conn.Superior Court.

[7]  After two evidentiary hearings of April 17, 2013, and May 21, 2013, Oronoque disclosed to the court, the fine levied April 30, 2012, for $9,738.32 was the basis of the foreclosure action.

7

27.     By falsely alleging nonpayment of common charge assessments in the foreclosure action, Oronoque and ZNC sought to elevate Oronoque into a super priority lien status [8] ahead of plaintiff's mortgage note owner who, according to the land records, was Webster.

28.     Oronoque also sought to activate Paragraph F [9] in Fannie Mae's Form 3140 which Webster required plaintiff to execute in 2004 at the time of her refinancing. Paragraph F is specific only to condominium dues and assessments.

29.     As a consequence of Oronoque's foreclosure action, plaintiff filed an civil action in state court on January 13, 2013 [10], against Oronoque and individual board members.

30.     On or around June 27, 2013, and for the first time, Webster refused to accept plaintiff's check for deposit into Oronoque's account contrary to Webster's previous readiness and acceptance of such payments (see ¶22).

31.     As a consequence of Webster's sudden and unexpected refusal, soon thereafter, plaintiff made several deposits directly into Oronoque's account at Peoples United Bank (Peoples) and prepaid her common charge assessments into 2014.

---

[8]   Elevation to super priority lien status is not applicable to fines levied by a condominium association.  See *Congress Street Condominium Association Inc. v Anderson*, 33 A.3d 274, 132 Conn.App. 536 (2011).

[9]   Paragraph F provides, "Remedies.  If Borrower does not pay condominium dues and assessments when due, then Lender may pay them.  Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument.  Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment."

[10]   *Smulley v Oronoque Shores, et al*, FBT-CV13-5029889-S, Conn. Superior Court.

32.     As a consequence of plaintiff's deposits into Oronoque's accounts at Peoples, Oronoque closed all known accounts at Webster and Peoples to prevent plaintiff from future payments.

33.     Soon thereafter, Oronoque learned of Mutual of Omaha Bank's (MOB) Phoenix, Arizona, banking facility which marketed MOB's Community Association Banking (CAB) program and provided out-of-state, online banking for condominium members and their payment of common charge assessments.

34.     Effective November 1, 2013, and continuing thereafter, Oronoque established one or more accounts with MOB to which Imagineers was granted direct and full access. Within Oronoque's account, each member of Oronoque was assigned an Internet portal link to which members could make payments online at any time. Oronoque then instructed MOB to block plaintiff's account, thereby preventing plaintiff from making any online payments which MOB did block.

35.     Since November 1, 2013, when Oronoque blocked plaintiff's account, and continuing through January, 2016, plaintiff made electronic wire transfers from her bank into Oronoque's account at MOB thus meeting her statutory and contractual obligations in the payment of her common charge assessments.

36.     On or around April, 2014, for the first time, Webster declared transfer of its beneficial interest in plaintiff's note to Fannie Mae retroactive to 2004. In support of Webster's disclosure, Webster submitted inadmissible copies of electronic pages from MERS computer system. Nothing in Webster's disclosure then and since, attested to or provide admissible evidence in support thereof. For the entire four-year period of active litigation in the state court foreclosure, neither Webster, MERS nor any other

9

party has come forward to declare a misjoinder and/or nonjoinder of parties. Webster remains mortgagee of record with MERS as Webster's nominee.

37.    Unaware of plaintiff's electronic wire transfers to Oronoque's MOB account and upon information and belief, ZNC's Pacelli established contact with Chase on or around August, 2013. Pacelli declared plaintiff delinquent in her payment of common charges, which she was not. Pacelli did so for the sole purpose of activating a payout under Paragraph F of Fannie Mae Form 3140.

38.    Chase failed to disclose Chase merely obtained the right to service the loan in 2004 and, therefore, had little if any interest in plaintiff's real property. Chase failed to possess authority to act absent authorization from the note holder and/or owner which Chase is not either.

39.    In order to secure a payout under Paragraph F of Form 3140, on or around August, 2014, Chase, without authorization of plaintiff's note holder and/or owner and without knowledge of plaintiff, charged $500 to plaintiff's mortgage account.

40.    On or around August, 2014, Chase also reported plaintiff in foreclosure for nonpayment of common charges to credit reporting agencies Experion, Trans Union and Equifax. Chase did such reporting as if holder and/or owner of plaintiff's note which, in fact, it was not.

41.    Chase appointed the law firm of Hunt Leibert & Jacobson LLC, Hartford, Connecticut (HLJ). When HLJ discovered Chase merely obtained the right to service the loan in 2004 and, therefore, had little if any interest in plaintiff's real property, HLJ failed to disclose. By HLJ's failure, the state court continued to be misled into believing Webster as the purported holder and/or owner which, in fact, Webster was not.

42.    On or around March, 2016, without plaintiff's knowledge and without authorization from plaintiff's note holder and/or owner, Chase charged $2,420.04 to plaintiff's mortgage account. Since then and continuing to the present time, plaintiff received numerous demand-for-payment letters from Chase as debt collector.

43.    Chase at no time was a named party to the state court foreclosure action or any other state court action. Chase merely obtained the right to service the loan in 2004 and, therefore, has little if any interest in plaintiff's real property. Therefore, Chase lacked standing to charge plaintiff's mortgage account as it did.

44.    Upon information and belief, Chase receives monthly servicing fees in the form of a fixed percentage on unpaid balances of the loans which Chase services.

45.    Upon information and belief, Chase acted intentionally to increase plaintiff's principal mortgage balance in order to collect higher fees.

46.    Upon information and belief, Chase committed similar acts upon other individuals to which Chase admitted making "embarrassing" and "egregious mistakes." As a result of Chase's unsafe and unsound mortgage servicing practices, Chase entered into a number of Consent Orders with both the Federal Reserve and the Office of Comptroller of the Currency [11].

47.    The defendants' individual and collective actions seek to deprive plaintiff of her equitable interest in her real property and, at the same time, capture and redirect plaintiff's equity towards themselves. These unlawful practices use "loop holes" in

_____
[11]   Agreement by and Between JPMorgan Chase Bank, N.A., Columbus, Ohio, and The Office of the Comptroller of the Currency, No. 2012--4-, February 12,2012; In the Matter of JPMorgan Chase Bank, NA, Columbus, Ohio, No. 2013-129, Amends No. 2011-050, February 29, 2013.

11

Fanny Mae Form 3140 for which Paragraph F was intentionally and specifically designed and which, statutorily, give the appearance of lawful when, in fact, the practices employed deprive borrowers of their right of due process which deprivation results in a scheme of conspiracy, extortion and fraud.

48.     The unlawful practices significantly interfered with plaintiff's timely payments of common charge assessments, practices which plaintiff seeks  equitable relief and monetary damages.

49.     The value of plaintiff's percent ownership interest in Oronoque, both beneficial and economic, depends entirely upon her meeting her statutory and contractual obligations.

50.     Plaintiff fully performed her statutory and contractual obligations to Oronoque and incurred additional expenses which would not had been incurred but for the tortious interference by the defendants.

51.     The willful, unlawful actions of the defendants affect the fair market value of plaintiff's real property and her credit standing.

52.     The collective actions of the defendants, whether direct or indirect, demonstrate a gross and negligent indifference of plaintiff's rights of due process.

53.     The collective actions of the defendants are arbitrary, capricious and in bad faith.

54.     The collective actions of the defendants are to disenfranchise plaintiff from her common law and due process rights and benefits as a United States citizen to own real property.

12

55. The collective actions of the defendants violate the precepts of corporate governance by scheming to advance their own financial gain and unjust enrichment.

56. The collective actions of the defendants devalue plaintiff's ownership interest and seek to deprive plaintiff of any interest in ownership of her real property.

57. The collective actions of the defendants have irreparably harmed plaintiff and continue to this present time.

58. The collective actions of the defendants' irreparable harm are not compensable by damages alone.

59. Plaintiff seeks injunctive relief which requires the defendants to (1) cease their unfair, unlawful, wrongful, unauthorized actions which prevent plaintiff's right of due process and her right to be heard and (2) whether direct or indirect, cease their threats, insults and false light of plaintiff's character and slander of her title to her real property.

60. The defendants' collective conduct was and continues to be willful, intentional, fraudulent and fraud on the court.

13

**COUNT ONE:       Tortious interference with statutory and contractual
                          obligations (Smulley v Webster)**

61.     Plaintiff repeats and realleges all allegations of paragraphs 1 - 60 as if
fully set forth herein.

62.     Upon information and belief, Webster is not the holder and/or owner of
plaintiff's mortgage note.

63.     Webster prevented plaintiff from meeting her statutory and contractual
obligations pursuant to, *inter alia,* §§ 47-76(b) and 47-257(b) of the General Statutes
and Article 15 and Section 11 of Oronoque's Declaration and Bylaws.

64.     Webster interfered by refusing to accept plaintiff's payments which
caused plaintiff extraordinary embarrassment and created a false light about her
person.

65.     Webster's interference and its sanction of Oronoque's overt aggression to
create a common charge assessments default was for the sole purpose of enabling
Oronoque to assert a super priority  lien status in Oronoque unlawful foreclosure action
which would place Oronoque's lien before the first security mortgage note holder and/or
owner.

66.     Upon information and belief, Webster communicated with nondefendants
Oronoque, Imagineers and ZNC and others on more than one occasion, telephonically
and/or electronically and/or in person, untrue, degrading and/or defamatory statements
and did so with malice and knowledge of their falsity and/or with a reckless disregard
for their truth or falsity.

14

67.     Webster's motives were improper, malicious and wrongful and interfered with plaintiff's statutory and contractual obligations.

68.     As a result of Webster's collective actions, plaintiff has been severely and irreparably damaged and incurred costs and expenses which would not have been incurred but for the tortious interference.

**COUNT TWO:          WITHDRAWN (by plaintiff)**

**COUNT THREE:        WITHDRAWN (by plaintiff)**

**COUNT FOUR:          Breach of implied covenant of good faith and fair dealing. (Smulley v Webster)**

69.     Plaintiff repeats and realleges all allegations of paragraphs 1 - 68 as if fully set forth herein.

70.     An covenant of good faith and fair dealing of plaintiff's rights as a member of Oronoque is implied in Oronoque's Declaration and Bylaws.  The covenant is further implied in each contract Oronoque executes on behalf of its membership including the contracts with Webster.

71.     Webster interfered with plaintiff's payments of her common charge assessments in order to create a payment default irrespective of Webster's previous acceptance without issue of such payments.

72.     Webster intentionally misled the state court by representing itself as plaintiff's mortgage note holder and/or owner when in fact Webster was not.

73.     Upon information and belief, Webster communicated with nondefendants Oronoque, Imagineers and ZNC and others on more than one occasion, telephonically and/or electronically and/or in person, untrue, degrading and/or defamatory statements

and did so with malice and knowledge of their falsity and/or with a reckless disregard for their truth or falsity.

74.     By Webster's deliberate and negligent misconduct, Webster breached the implied covenant of good faith and fair dealing.

75.     As a result of said breach, plaintiff has been damaged and incurred costs and expenses which would not have been incurred but for the stated breaches.

**COUNT FIVE:     Unfair Trade Practices (CUPTA)**
**                          (Smulley v Webster)**

76.     Plaintiff repeats and realleges all allegations of paragraphs 1 - 75 as if fully set forth herein.

77.     Webster, in providing plaintiff mortgage financing in 2004, was engaged in trade and/or commerce and continues to be engaged in trade and/or commerce up to the present time.

78.     Webster, while engaged in trade and/or commerce, committed unfair and deceptive acts and practices as follows;

a.     failed with intent to disclose to plaintiff of the purported assignment of her mortgage note at the time of assignment in 2004;

b.     failed with intent to disclose to plaintiff the purpose of MERS as its nominee and the adverse effects on note ownership such appointment of MERS creates;

c.     exercised undue delay by waiting until 2014 to disclose to plaintiff its purported assignment of Webster's beneficial interest;

16

     d.     failed to provide admissible evidence which supported its purported assignment;

     e.     knowingly aided and abetted Oronoque, Imagineers and ZNC in the interference of plaintiff's statutory and contractual obligations in the timely payment of her common charge assessments;

     f.     falsely misled state court with intent to believe Webster was the holder and/or owner of plaintiff's mortgage note when, in fact, it was not.

     79.     Webster's conduct offends public policy, is immoral, unethical, oppressive and/or unscrupulous and causes substantial injury to consumers in several ways including;

     a.     denies correct information and promulgates false information;

     b.     falsely induces consumers into believing Webster remains their note holder and/or owner;

     c.     requires consumers to incur significant costs and expenses to determine the true holder and/or owner of their mortgage note;

     d.     provides consumers untimely, inaccurate and/or conflicting information about their mortgage loan.

     80.     Upon information and belief, Webster communicated with nondefendants Oronoque, Imagineers and ZNC and others on more than one occasion, telephonically and/or electronically and/or in person, untrue, degrading and/or defamatory statements and did so with malice and knowledge of their falsity and/or with a reckless disregard for their truth or falsity.

81.    Webster's collective conduct as stated was intentional and willful and meant to harm plaintiff which it did and continues to harm plaintiff by its denial of correct information and promulgation of false information as to the identify of the holder and/or owner of plaintiff's note.

82.    Webster's collective conduct as stated was unethical, unscrupulous, unfair and deceptive and constituted an unfair method of trade practices in violation of Connecticut Unfair Trade Practices Act, Conn. General Statute § 42-110b(a) (CUPTA).

83.    Webster's violation of § 42-110b(a) was carried out for the purposes of capturing and depriving plaintiff of her substantial equity in her real property.

84.    As a result of Webster's violations of CUPTA, plaintiff has been severely and irreparably damaged and suffered ascertainable losses to her credit worthiness including economic losses involved from the state court litigations which would not have been incurred but for Webster's unfair trade practices.

**COUNT SIX:**    **WITHDRAWN (by plaintiff) AND REPLED IN COUNT NINETEEN**

**COUNT SEVEN:**    **False Light Invasion of Privacy**
**(Smulley v Webster)**

85.    Plaintiff repeats and realleges all allegations of paragraphs 1 - 84 as if fully set forth herein.

86.    Upon information and belief, Webster made defamatory statements about plaintiff, intentionally concealed such defamatory statements from plaintiff, and then caused such defamation to be recorded permanently in documents.

18

87.     Webster cast plaintiff in a false light by refusing to accept her payment of Oronoque's common charge assessments and allowing such refusal to be seen by all present in Webster's branch office to further embarrass and demean plaintiff.

88.     Webster cast plaintiff in a false light by participating in Oronoque's state court foreclosure action which falsely alleged nonpayment of common charge assessments and did so participate knowing such lawsuit and false allegations became, from that time forward, public record and would remain public record well-beyond plaintiff's life expectation.

89.     Upon information and belief, Webster communicated with nondefendants Oronoque, Imagineers and ZNC and others on more than one occasion, telephonically and/or electronically and/or in person, untrue, degrading and/or defamatory statements and did so with malice and knowledge of their falsity and/or with a reckless disregard for their truth or falsity.

90.     The defamatory statements made by Webster were willful and intended to seriously harm plaintiff's reputation and impugned her character, integrity, honesty and trustworthiness.

91.     Further, the defamatory statements made by Webster involve charges of moral turpitude, improper conduct, or lack of integrity as a person calculated to cause her personal injury which has disrupted her peaceful enjoyment of her privacy and property and caused her humiliation, emotional distress and economic loss.

92.     As a result of the defamatory statements, plaintiff has sustained damages and continues to suffer costs and expenses which would not have been incurred but for Webster's false light and invasion of plaintiff's privacy.

**COUNT EIGHT:    Negligent Infliction of Emotional Distress**
**(Smulley v Webster)**

93.    Plaintiff repeats and realleges all allegations of paragraphs 1 - 92 as if fully set forth herein.

94.    By Webster's conduct as alleged herein, Webster engaged in extreme and outrageous conduct involving an unreasonable and foreseeable risk of causing plaintiff emotional distress, especially;

a.    in blocking, interrupting, interfering, and/or preventing plaintiff from payment of her common charge assessments statutorily and contractually due;

b.    in misleading the state court by falsely presenting itself as holder and/or owner of plaintiff's mortgage note when Webster was not;

c.    in voluntarily participating and being complicit with nondefendants Oronoque, Imagineers and ZNC and others without any consideration of adverse consequences to plaintiff;

d.    in casting plaintiff in a false light;

e.    further defaming plaintiff by publicly participating in the state court foreclosure action which Webster knew or in the exercise of reasonable care, should have known, was based on false allegations of nonpayment of her common charge assessments and then sought to prevent plaintiff's payment in order to justify its participation in the foreclosure after the lawsuit was filed;

f.    communicating with nondefendants Oronoque, Imagineers and ZNC and others on more than one occasion, telephonically and/or electronically and/or in

20

person, untrue, degrading and/or defamatory statements and did so with malice and knowledge of their falsity and/or with a reckless disregard for their truth or falsity.

95.    Webster knew, or in the exercise of reasonable care should have known, it was negligent, Webster's actions are a direct result of its own negligence and its negligence would cause emotional distress and harm to the plaintiff of which plaintiff suffered and continues to suffer.

96.    Webster's collective conduct as alleged was extreme and outrageous and would cause an average person to exclaim *"Outrageous!"*.

**COUNT NINE:        Intentional Infliction of Emotional Distress**
**                          (Smulley v Webster)**

97.    Plaintiff repeats and realleges all allegations of paragraphs 1 - 96 as if fully set forth herein.

98.    The consequences of Webster's collective extreme and outrageous actions were inflicted in bad faith and intended to cause and did cause plaintiff emotional distress and harm of which plaintiff continues to suffer.

**COUNT TEN:        WITHDRAWN (by plaintiff) AND REPLED AS COUNT NINETEEN**

**COUNT ELEVEN:  WITHDRAWN  (by plaintiff)**

**COUNT TWELVE:  WITHDRAWN  (by plaintiff)**

21

**COUNT THIRTEEN:**       **Unfair Trade Practices (CUPTA)**
                        **(Smulley v MERS)**

99.    Plaintiff repeats and realleges all allegations of paragraphs 1 - 98 as if fully set forth herein.

100.    MERS, in acting as Webster's nominee during the time of plaintiff's mortgage refinancing in 2004, was and continues to be engaged in trade and/or commerce.

101.    MERS, while thus engaged committed unfair and deceptive acts and practices as follows;

a.    failed with intent to disclose to plaintiff the purported assignment of her mortgage note at the time of assignment in 2004;

b.    failed with intent to disclose to plaintiff the real risks posed by MERS as nominee and the adverse effects on note ownership such appointment creates;

c.    falsely misled state court with intent to believe MERS continued to serve as Webster's nominee when, in fact, it was not;

d.    withheld from plaintiff and state court, MERS lacks any rights to transfer plaintiff's mortgage note and lacks authority to physically possess plaintiff's note.

102.    MERS' conduct offends public policy, is immoral, unethical, oppressive and/or unscrupulous and causes substantial injury to consumers in several ways including;

a.    denies correct information and promulgates false information;

b.    falsely induces consumers into believing the mortgage originator remains their note holder and/or owner;

22

c.      requires consumers to incur significant costs and expenses to determine the true holder and/or owner of their mortgage note if such identity exists;

d.      provides consumers untimely, inaccurate and/or conflicting information about their mortgage loan;

e.      fails to advise consumers MERS lacks authority to transfer loan notes and/or physically possess such notes because MERS fails to possess a sufficient legally-cognizable interest in the debt secured by mortgages registered in the MERS system, thus the validity of title of the promissory notes and mortgages is clouded and remains so thereafter.

103.    MERS' collective conduct as stated was intentional and willful and meant to harm plaintiff which it did and continues to harm plaintiff by its denial of correct information and promulgation of false information as to the identify of the holder and/or owner of plaintiff's note.

104.    MERS' collective conduct as stated was unethical, unscrupulous, unfair and deceptive and constitute an unfair method of trade practices in violation of Connecticut Unfair Trade Practices Act, Conn. General Statute § 42-110b(a) (CUPTA).

105.    MERS' violation of § 42-110b(a) was carried out for the purposes of capturing and depriving plaintiff of her substantial equity in her real property.

106.    As a result of MERS' violations of CUPTA, plaintiff has been severely and irreparably damaged and suffered ascertainable losses to her credit worthiness including economic losses involved from the state court litigations which would not have been incurred but for MERS' unfair trade practices.

**COUNT FOURTEEN:**    **Breach of contract - Third Party Beneficiary**
                        **(Smulley v Chase)**

106.    Plaintiff repeats and realleges all allegations of paragraphs 1 - 105 as if
fully set forth herein.

107.    Upon information and belief, Chase is not the holder and/or owner of
plaintiff's mortgage note but merely obtained the right to service plaintiff's loan in 2004
and, therefore, has little if any interest in plaintiff's real property.

108.    Sometime after plaintiff executed the original loan documents with
Webster, Webster transferred servicing of plaintiff's loan to Chase whereby plaintiff, as
an intended third-party beneficiary, would fulfill her promissory note obligations through
payments made to Chase.

109.    Sometime prior to August, 2013, and continuing thereafter, Chase
communicated with nondefendants Oronoque, Imagineers and ZNC and others on
more than one occasion, telephonically and/or electronically and/or in person, untrue,
degrading and/or defamatory statements and did so with malice and knowledge of their
falsity and/or with a reckless disregard for their truth or falsity.

110    From August, 2014, and continuing through to February, 2016, as a result
of communications with the stated nondefendants, Chase charged plaintiff's mortgage
account on numerous occasions without plaintiff's knowledge which charges
accumulated to $2,420.04.

111    Chase failed to disclose its manipulation of plaintiff's mortgage account to
plaintiff and failed to provide any specific information regarding such charges although
requested to do so on more than one occasion.

24

112    Chase demanded payment of the charges which placed plaintiff under a technical default which triggers a bank foreclosure.

113    Chase altered dates on correspondence and significantly delayed mailing correspondence in order to place Chase in a better light and place plaintiff in a false light.

114    Chase reported false and erroneous information to the credit reporting agencies without plaintiff's knowledge and without first making any attempt to verify the false and erroneous information obtained.

115    Chase placed itself as "defendant" in Oronoque's state court foreclosure action against plaintiff when, in fact, Chase was not a named defendant nor was joined as a named defendant at any time during the pendency of the action.

116    Chase knew, or in the exercise of reasonable care, should have known MERS as nominee for Webster was misjoined in Oronoque's state court foreclosure action and failed to disclose to the court such misjoinder.

117    Chase failed with intent to notify the state court its intent to charge plaintiff costs in order to circumvent the state foreclosure process.

118    Chase lacked authority to proceed against plaintiff and the state court as stated, which authority rests exclusively with the holder and/or owner of plaintiff's note, which identity of holder and/or owner is unknown and may never be known.

119    Plaintiff performed obligations to Chase as servicer by making payments according to the amounts required by the terms of plaintiff's mortgage note.

120.    Chase failed to perform its obligations as servicing agent for the holder and/or owner, the identify of which is unknown and may never be known, by manipulating plaintiff's mortgage account and entering false sums against the account thereby creating additional debt which would not exist but for Chase's failures.

121.    Plaintiff was damaged as a direct and proximate result of Chase's breaches. Plaintiff suffered financial damages to her credit worthiness including economic losses involved from the state court litigations which would not have been incurred by for Chase's breaches.

## COUNT FIFTEEN:  Breach of implied covenant of good faith and fair dealing (Smulley v Chase)

122.    Plaintiff repeats and realleges all allegations of paragraphs 1 - 121 as if fully set forth herein.

123.    A covenant of good faith and fair dealing of plaintiff's rights as a mortgagor and borrower is implied in the servicing of plaintiff's original loan documents in which Chase is servicer since 2004.

124.    Chase manipulated plaintiff's mortgage account by charging sums against her account without authority of the holder and/or owner of her promissory note and did so for a period of over two years. Chase then commenced debt collection proceedings against plaintiff demanding payment of $2,420.04.

125.    Chase failed to inform state court at any time of its role as servicer only because Chase knew neither Webster nor MERS had any beneficial interest in plaintiff's real property, and because Chase did not know the identify of the holder and/or owner who had beneficial interest and may never know the identity.

26

126. To further hide and protect its own identity, Chase failed to disclose to state court its intent to charge plaintiff for litigation costs in the foreclosure action to which Chase was not a named defendant because Chase, routinely, circumvented the authority of state court and sidestepped the foreclosure process in order to collect usurious fees which would not be permissible and/or collectible under state court scrutiny.

127. Upon information and belief, Chase communicated with nondefendants Oronoque, Imagineers and ZNC and others on more than one occasion, telephonically and/or electronically and/or in person, untrue, degrading and/or defamatory statements and did so with malice and knowledge of their falsity and/or with a reckless disregard for their truth or falsity.

128. By Chase's deliberate and negligent misconduct, Chase breached the implied covenant of good faith and fair dealing.

129. As a result of said breaches, plaintiff has been damaged and incurred costs and expenses which would not have been incurred but for the stated breaches.

**COUNT SIXTEEN:     Unfair Trade Practices (CUPTA)
                    (Smulley v Chase)**

131. Plaintiff repeats and realleges all allegations of paragraphs 1 - 130 as if fully set forth herein.

132. Chase, in the servicing of plaintiff's mortgage promissory note commencing 2004, is engaged in trade and/or commerce and continues to be engaged in trade and/or commerce up to the present time.

133. Chase, while engaged in trade and/or commerce, committed unfair and

27

deceptive acts and practices as follows;

a.     failed with intent to disclose to plaintiff Chase's intent to manipulate and charge plaintiff account prior to such charges being placed thereon;

b.     failed with intent to disclose and/or produce documentation which supported Chase's actions and the authority upon which its actions rested;

c.     exercised undue delay by waiting until after the state court foreclosure proceeding was withdrawn to claim purported litigation costs;

d.     demanded payment o $2,420.04 to which Chase was not entitled nor had authority to demand;

e.     altered dates on correspondence and significantly delayed mailing of such correspondence;

f.     reported false and erroneous information to the credit reporting agencies without first making any attempt to verify the false and erroneous information Chase intended to use;

g.     failed with intent to make itself known to the state court during the four-year foreclosure proceeding;

h.     failed with intent to inform the state court Webster and MERS were misjoined in the foreclosure proceeding;

I.     failed with intent to inform the state court the identity of the true holder and/or owner of plaintiff's mortgage note;

j.     knowingly aided and abetted Oronoque, Imagineers and ZNC in their attempts to deprive plaintiff of her equity interest in her real property;

k.     lacked authority of plaintiff's holder and/or owner to act as above stated;

I.      denied plaintiff procedural due process to which she has a right to be heard and a fair hearing.

134.    Chase's conduct offends public policy, is immoral, unethical, oppressive and/or unscrupulous and causes substantial injury to consumers in several ways including;

a.      denies correct information and promulgates false information;

b.      manipulates and charges unsubstantiated charges onto mortgage accounts Chase services without the knowledge of the consumer-borrower thus depriving consumer-borrowers of procedural due process rights;

c.      requires consumers to incur significant costs and expenses to obtain procedural due process when such costs and expenses are unnecessary but for Chase's unfair trade practices;

d.      provides consumers untimely, inaccurate and/or conflicting information about their mortgage loan;

e.      falsely induces consumers into believing Chase's conduct as cited is sanctioned by the judicial system when, in fact, it is not.

135.    Upon information and belief, Chase communicated with nondefendants Oronoque, Imagineers and ZNC and others on more than one occasion, telephonically and/or electronically and/or in person, untrue, degrading and/or defamatory statements and did so with malice and knowledge of their falsity and/or with a reckless disregard for their truth or falsity.

136.    Chase's collective conduct as stated was intentional and willful and meant
to harm plaintiff which it did and continues to harm plaintiff by its denial of correct
information and promulgation of false information as to the identify of the holder and/or
owner of plaintiff's note.

137.    Chase's collective conduct as stated was unethical, unscrupulous, unfair
and deceptive and constituted an unfair method of trade practices in violation of
Connecticut Unfair Trade Practices Act, Conn. General Statute § 42-110b(a) (CUPTA).

138.    Chase's violation of  § 42-110b(a) was carried out for the purposes of
capturing and depriving plaintiff of her substantial equity of her real property.

139.    As a result of Chase's violations of CUPTA, plaintiff has been severely
and irreparably damaged and suffered ascertainable losses to her credit worthiness
including economic losses involved from the state court litigations which would not
have been incurred but for Chase's unfair trade practices.

**COUNT SEVENTEEN:    False Light Invasion of Privacy**
**(Smulley v Chase)**

140.    Plaintiff repeats and realleges all allegations of paragraphs 1 - 139 as if
fully set forth herein.

141.    Upon information and belief, Chase made defamatory statements about
plaintiff, intentionally concealed such defamatory statements from plaintiff, and then
caused such defamation to be recorded by the credit report agencies which would harm
plaintiff for a period of no less than seven years.

142.   Chase cast plaintiff in a false light by supporting Oronoque's state court foreclosure action which falsely alleged nonpayment of common charge assessments and did so without first verifying with plaintiff such misinformation.  Chase did so knowing such foreclosure and the related false allegations became, from that time forward, public record and would remain public record well-beyond plaintiff's life expectation.

143.   Upon information and belief, Chase communicated with nondefendants Oronoque, Imagineers and ZNC and others on more than one occasion, telephonically and/or electronically and/or in person, untrue, degrading and/or defamatory statements and did so with malice and knowledge of their falsity and/or with a reckless disregard for their truth or falsity.

144.   The defamatory statements made by Chase were willful and intended to seriously harm plaintiff's reputation and impinge her character, integrity, honesty, trustworthiness and credit worthiness.

145.   Further, the defamatory statements made and facilitated by Chase involve charges of moral turpitude, improper conduct, or lack of integrity as a person calculated to cause her personal injury which has disrupted her peaceful enjoyment of her privacy and property and caused her humiliation, emotional distress and economic loss.

146.   As a result of the defamatory statements, plaintiff has sustained damages and continues to suffer costs and expenses which would not have been incurred ut for Chase's false light and invasion of plaintiff's privacy.

**COUNT EIGHTEEN:       Vicarious Liability (Smulley v Fannie Mae; FHFA)**

147.    Plaintiff repeats and realleges all allegations of paragraphs 1 - 146 as if fully set forth herein.

148.    Fannie Mae is a government sponsored enterprise under the conservatorship of FHFA, an agency of the United States.

149     Under the common-law standard, a contract is unconscionable if there is an absence of meaningful choice on the part of one of the parties (procedural unconscionability) together with contract terms which are unreasonably favorable to the other party (substantive unconscionability).  A procedural element of an unconscionable contract generally creates a contract of adhesion which is a contract drafted and imposed by the party of superior bargaining strength which relegates to the subscribing party only the opportunity to adhere to the contract or reject it.

150.    Plaintiff refinanced the mortgage on her real property with Webster in 2004. As a condition precedent to closing and not disclosed to plaintiff prior to closing, Webster required plaintiff to sign Fannie Mae's Form 3140 (E1-2) which is particular only to owners of condominiums.  Form 3140 is designed to govern the relationship between the borrower and the condominium association by interposing the lender in the borrower's contractual relationship with the association.  Paragraph F further provides for penalties against the borrower for the benefit of the condominium association and others, nonparties to Form 3140 and nonparties to plaintiff's promissory note.  Paragraph F permits penalties to be imposed against the borrower without notice and without hearing.

32

151.    The terms and demands contained in Fannie Mae's Form 3140 Paragraph F constitute an unenforceable penalty.  A contract provision which imposes a penalty for a breach is contrary to public policy and invalid because the paragraph fails to fix liquidated damages.  Instead, Paragraph F permits a float, that is, liquidated damages could be as low as $1 or as high as $100,000-plus, which in this present matter, is controlled by nondefendants Oronoque, Imagineers, ZNC and facilitated by Webster, MERS, Chase and Fannie Mae.  Simply put, the penalty set forth in Paragraph F is unenforceable because the promissory note can be accelerated at the option of the condominium association and bypass the holder and/or owner.

152.    Fannie Mae's Form 3140 Paragraph F provides actual authority to a condominium association and the mortgage lender to act on its behalf without notice to the borrower and without hearing, thus depriving the borrower of due process rights with intent.  Paragraph F also provides for apparent authority to any  representative of the condominium association and the mortgage lender because the broad language of Paragraph F demonstrates sufficient authority to embrace Fannie Mae's intent.

153.    The result of Fannie Mae's Form 3140 unconscionability has severely harmed plaintiff and placed plaintiff into the hands of the defendants and nondefendants' predatory scheme as pled in Count Nineteen, Civil RICO.

154.    Nondefendant ZNC's Pacelli contacted Chase sometime prior to August, 2013, and activated Paragraph F by falsely claiming nonpayment of common charges by plaintiff.  Chase, fully cognizant of Form 3140 Paragraph F, readily set in motion charges to plaintiff's mortgage account without plaintiff's knowledge and without any verification of Pacelli's representations and without a hearing.

33

155.   Form 3140 Paragraph F diminishes the power of the courts to determine the rights of parties which affects real property and places a condominium association beyond the court's jurisdiction which is impermissible and unfair to the borrower.

156.   Form 3140 Paragraph F authorizes the deprivation of a significant property interest protected by the Fifth Amendment of the United States Constitution.

157.   Form 3140 Paragraph F encouraged seizure of plaintiff's property and tainted plaintiff's credit rating, all of which placed plaintiff's mortgage in a technical default.

158.   Form 3140 Paragraph F interferes with plaintiff's title to, possession of and use and enjoyment of her real property.

159.   Form 3140 Paragraph F  fails to make any distinction with fines levied as distinguished by the state of Connecticut. (see p.8, n.8).

160.    Fannie Mae's Form 3140 violated plaintiff's due process on its face and as applied by the defendants and nondefendants by failing to provide notice and an opportunity to be heard at a meaningful time and in a meaningful manner.

161.   Fannie Mae is vicariously liable to plaintiff for the actions of the defendants and nondefendants which actions would not have occurred but for Paragraph F.

162.   As a result of Fannie Mae's vicarious negligence and due process violations, plaintiff has sustained damages and continues to suffer costs and expenses which would not have been incurred but for, generally, Form 3140 and, specifically, Paragraph F.

34

**COUNT NINETEEN:**     **CIVIL RICO 18 USC § 1964**
                                   **(Smulley v Webster, MERS, Chase, Fannie Mae/FHFA)**

163.    Plaintiff repeats and realleges all allegations of paragraphs 1 - 162 as if fully set forth herein.

164.    Plaintiff is a natural person and as such is a "person" within the meaning of   18 USC § 1961 (3).

165.    Defendants are natural persons and corporate entities and as such, are "persons" within the meaning of 18 USC § 1961 (3).

**The Enterprise**

166.    On information and belief, the defendants comprise a distinct group which together form an enterprise within the meaning of 18 USC § 1961(4). Each and every defendant is employed by or associated with the enterprise.

167.    On information and belief, the individuals and entities which constitute the enterprise are an association-in-fact within the meaning of 18 USC § 1961(4).

168.    The purpose of the enterprise is to secure foreclosure judgments on individual condominium properties through fraudulent means and to use those judgments to extract money from the owners of the condominiums (unit owners) through their equity interest thereby depriving the owners of their equity assets. This is accomplished by nondefendant Imagineers refusing to accept the unit owners' payments for common charge assessments; nondefendant ERIN establishing blocks in nondefendant MOB's banking system to prevent acceptance of unit owners' payments; defendant Webster and nondefendant MOB refusing to deposit the unit owners' payments; and nondefendant ZNC returning unit owners' payments when forwarded by

Imagineers; ZNC commencing foreclosure actions in state court for nonpayment in the name of nondefendant Oronoque. Unit owners' mortgagees who have first priority lien status are put on notice by ZNC with activation of defendant Fannie Mae's Form 3140 Paragraph F activated. Fraudulent affidavits are submitted in furtherance of the scheme.

169. Upon information and belief, nondefendant Imagineers manages condominium properties which account for over 17,000 units throughout Connecticut, approximately 20% of the total in the state. If the enterprise's scheme is implemented on just 1% of unit owners per year with an average gross return per enterprise foreclosure of $20,000, the enterprise's gross per year is $3.4 million. Imagineers is also in the business of actively lobbying Connecticut state legislators to prevent pending legislation which will impair or affect the activities of the enterprise scheme and to supplement existing legislation which will strengthen and legitimize those activities.

170. Upon information and belief, nondefendant ZNC represent a substantial number of condominium properties which account for thousands of units placed in foreclosure. Attorneys Robert A. Pacelli, Jr. (Pacelli), a shareholder and partner, and his associate, Joseph Cessario (Cessario) are responsible for ZNC's condominium association clients.

171. The enterprise has been engaged and continues to be engaged in activities which affect interstate commerce. Defendants' and nondefendants unlawful enterprise in violation of RICO has been and remains long-standing, continuous and open ended. Plaintiff is one of many victims of such racketeering activity.

**Pattern of racketeering activity - mail and wire fraud**

172.   Defendants and nondefendants, individually and as an enterprise, have engaged, directly or indirectly, in a pattern of racketeering activity as described below in violation of 18 USC § 1962(c) and (d).

173.   Defendants and nondefendants, acting individually and as part of the enterprise, have devised a scheme to defraud and to obtain money or property by means of false and fraudulent pretenses and representations.  The scheme includes but is not limited to;

a.   fraudulently creating a debt when in fact no debt exist;

b.   blocking, interrupting, interfering and/or preventing payments of common charge assessments;

c.   producing and filing fraudulent affidavits which falsely claim defendants have personal knowledge of facts to obtain a foreclosure judgment when, in fact, they do not;

d.   misrepresenting defendants and nondefendants are in possession of or could obtain documentation evidencing a debt when in fact, they did not possess nor can obtain such documentation;

e.   using fraudulent, deceptive and misleading affidavits to obtain foreclosure judgments against unit owners under false pretenses;

f.   using fraudulently obtained foreclosure judgments to extract money from unit owners;

g.   using unit owners' participating mortgagees as the *"store front"* to obtain the money; and

37

h.       using Fannie Mae's Form 3140 Paragraph F as the cash register.

174.   Defendants and nondefendants, acting individually and as part of the enterprise, have made fraudulent misrepresentations on specific occasions as follows;

a.       on April 30, 2012, and May 31, 2012,  demanded or caused to be demanded payment of a condominium association debt which, in fact, did not legally exist nor ever existed;

b.       on July 12, 2012, October 25, 2012, January 8, 2013, and October 1, 2013, sent or caused to be sent letters to plaintiff demanding she cease paying her common charges to Oronoque;

c.       on October 25, 2012, January 8, 2013, and October 1, 2013, sent or caused to be sent letters to plaintiff threatening plaintiff and her spouse with further legal action which, in fact, it could not legally take;

d.       on August 8, 2012, and November 19, 2012, filed or caused to be filed fraudulent lawsuits in state court based upon allegations claimed to be true when they were not;

e.       on  January 15, 2013, and September 25, 2013, filed or caused to be filed fraudulent affidavits in state court falsely claiming personal knowledge of the facts necessary to secure a foreclosure judgment when they did not;

f.       On or around March 11, 2014, filed or caused to be filed a fraudulent affidavit in state court disclaiming beneficial interest in plaintiff's promissory note while including copies of electronic documents as admissible evidence when they were not.

175.   The fraudulent misrepresentations above are described in more detail in ¶¶ 13-162 of this FAC and plaintiff' Amended RICO Case Statement (ECF80).

38

176. Defendants and nondefendants, acting individually and as part of the enterprise, have used the mails and wires and have caused the mails and wires to be used, or reasonably knew the mails and wires would be used, in furtherance of their fraudulent scheme. Specifically;

a. In letters dated July 12, 2012, October 25, 2012, January 8, 2013, and October 1, 2013, ZNC's Pacelli sent letters to plaintiff and her spouse via the United States Postal Service (USPS) in which Pacelli demanded plaintiff stop making payments to Oronoque. Pacelli further demanded plaintiff make her payments payable to ZNC by certified bank check or money order even though Pacelli and others were defendants in plaintiff's prior pending state court actions (see p.6, n.3). As a means to intimidate compliance with Pacelli's enterprise racketeering activity, Pacelli's letters clearly threatened plaintiff and her spouse with additional legal action which could not be legally taken;

b. In letters dated July 24, 2012, August 21, 2012, September 20, 2012, and November 29, 2012, Marietta R. Stone Anastas , a ZNC paralegal employee who works for Pacelli, sent letters to plaintiff via USPS, all of which returned plaintiff's timely payments of common charges and in which Anastas demanded payment payable to ZNC;

c. Sometime prior to May, 2013, nondefendants telephonically and/or electronically contacted Webster, holder of several deposit accounts for Oronoque, about its enterprise. Webster agreed to participate in the enterprise and became part of the association-in-fact. As an enterprise participant, Webster closed Oronoque's bank account into which plaintiff made payments during July, 2012, through April, 2013;

d.    After plaintiff's May, 2013, payment deposited into Oronoque's other account at Webster, the nondefendants telephonically and/or electronically contacted Webster again and instructed Webster to refuse any future payments. As a result, on June 28, 2013, when plaintiff attempted to pay her June, 2013, common charge, Webster employees, Kadie Ortiz and Elizabeth Allard, refused to accept plaintiff's check. In full view and hearing of other Webster customers and other Webster employees, plaintiff was addressed and spoken to as if she was of such character as an average person of character would refuse to acknowledge. The aspersions cast upon plaintiff by Webster employees were insulting, demeaning and meant to ostracize her among them. Thus, Webster conspired and participated with the enterprise, thereby establishing itself as a cooperative participant in the enterprise's racketeering conduct;

e.    After plaintiff's June, 2013, payment deposited into Oronoque's other account maintained at Peoples United Bank (Peoples), the nondefendants telephonically and/or electronically contacted Peoples and instructed Peoples to close Oronoque's account which Peoples did;

f.    Sometime prior to August, 2013, the nondefendants telephonically and/or electronically contacted nondefendants ERIN and MOB about its enterprise. ERIN and MOB agreed to participate in the enterprise and became part of the association-in-fact. As a participant in the enterprise, ERIN, domiciled in Massachusetts and the New England representative for MOB, introduced MOB to Oronoque, Imagineers and ZNC. MOB, domiciled in Phoenix, Arizona, and having no physical presence in Connecticut, agreed to extend the enterprise's efforts to prevent plaintiff's payments;

40

g.      On or around August 21, 2013, Imagineers employee, Jennifer L. Feiman
(Feiman), telephonically and/or electronically introduced MOB's out-of-state Community
Association Banking (CAB) program to Oronoque.  With MOB documents forwarded
electronically and/or through the USPS, Feiman presented MOB's documents during an
Oronoque Board of Directors meeting.  Board members James Chacho and John
Sinanian, president, moved for acceptance.  MOB's program became effective
November 1, 2013;

h.      Feiman telephonically and/or electronically contacted ERIN and MOB and
established the program.  In a notice dated October 21, 2013, Feiman mailed notices to
Oronoque's unit owners through the United States Postal Service.  MOB's out-of-state
extension of the enterprise selectively permitted or prevented unit owner payments
which either had be paid through MOB's Internet website or by USPS mail.  Plaintiff
was locked out of MOB's program with intent from inception.  Thus, ERIN and MOB
conspired and participated with the enterprise, thereby establishing themselves as
cooperative participants in the enterprise's racketeering conduct;

i.      Sometime prior to August 13, 2013, Pacelli telephonically and/or
electronically contacted MERS about its enterprise.  MERS agreed to participate in the
enterprise and became part of the association-in-fact.  As an enterprise participant,
MERS telephonically and/or electronically contacted Webster for the sole purpose of
withholding MERS and Webster's purported transfer of beneficial interest in plaintiff
mortgage note from state court.  MERS and Webster continued to withhold with intent
up to the time the state court foreclosure action was withdrawn on January 11, 2016;

j.      Sometime prior to August 13, 2013, Pacelli telephonically and/or electronically contacted Chase, servicer of plaintiff's mortgage note, about its enterprise. Chase agreed to participate in the enterprise and became part of the association-in-fact. As an enterprise participant and commencing August 19, 2014, and continuing on September 10, 2014, September 11, 2014, September 8, 2015, September 9, 2015, October 20, 2015, October 23, 2015, February 19, 2016, and February 20, 2016, Chase electronically accessed and made charges against plaintiff's mortgage account which totaled $2,420.04. Chase did so without plaintiff's knowledge and without authority from plaintiff's holder and/or note owner;

k.      In letters dated April 1, 2016, April 4, 2016, April 11, 2016, April 22, 2016, and June 15, 2016, and mailed through the USPS, Chase demanded payment of $2,420.04 placing plaintiff's mortgage in a technical default. Chase did so without plaintiff's knowledge and without authority from plaintiff's holder and/or note owner;

l.      From August, 2013 and continuing up to the present time, Chase telephonically and/or electronically contacted the credit reporting agencies Experion, Trans Union and Equifax. Chase falsely reported plaintiff was in default in the payment of her common charges to Oronoque which Chase knew, or in the exercise of reasonable care, should have known, plaintiff was not. Chase did so without plaintiff's knowledge and without authority from plaintiff's holder and/or note owner.

177.   The defendants and nondefendants, acting individually and as part of the enterprise, have used the mails and wires and have caused the mails and wires to be used, or reasonably knew the mails and wires would be used, in furtherance of their fraudulent scheme and have used the state court, the federal court and the courts'

42

respective electronic filing systems and sent plaintiff copies of such documents using Internet email and/or USPS in furtherance of their scheme. Specifically;

    a.    In a sworn affidavit dated August 1, 2012 (efiled August 2, 2012), ZNC's Cessario falsely stated plaintiff's prior pending state court action (see p.6,n.3) was unrelated to the enterprise's activity when, in fact, ZNC partner and their represented counsel, Sabato Fiano (Fiano), testified otherwise;

    b.    In a sworn affidavit dated August 1, 2012 (efiled August 2, 2012), Pacelli signed a similarly worded document which falsely stated plaintiff's prior pending state court action (see p.6, n3) was unrelated to the enterprise's activity when, in fact, Fiano testified otherwise;

    c.    On November 19, 2012, and continuing up to January 11, 2016, when the state court actions were withdrawn, Pacelli and/or Cessario repeatedly efiled, and continue to efile, numerous documents in state court falsely stating plaintiff's common charge delinquency when, in fact, she was not.

    d.    In a sworn affidavit dated August 6, 2012 (efiled August 8, 2012), Oronoque's Sinanian falsely stated the allegations for the unlawful fine levied were true when, in fact, the court found September 28, 2012, they were not. Sinanian continued his false statements in sworn affidavits dated November 20, 2012 (efiled March 12, 2013), January 15, 2013 (efiled January 16, 2013), and September 25, 2013 (efiled September 26, 2013), irrespective of the court's finding.

    e.    In separate sworn affidavits dated November 20, 2012 (efiled March 12, 2013), January 9, 2013 (efiled January 15, 2013), January 15, 2013 (efiled January 16, 2013), and December 3, 2013 (efiled December 4, 2013), Feiman falsely stated the

43

allegations for the unlawful fine levied were true when, in fact, the court found September 28, 2012, they were not.

     f.     In the federal district court foreclosure companion case, No. 3:14-cv-362, and in Oronoque's prior pending state court foreclosure action (see p.7, n.6) upon information and belief, ZNC 's Jonathan Elliot (Elliot) (since deceased), Fiano, Pacelli and Cessario exerted influence over the state court actions, in that, they failed to disclose Elliot and Fiano were coworkers, partners and/or shareholders in a law firm with Theodore Tyma prior to Mr. Tyma's (now Judge Tyma) appointment to the bench. Judge Tyma presided over Oronoque's state foreclosure action against plaintiff and Fiano represented Oronoque.  Upon information and belief, these undisclosed relationships caused the court  to rule in a manner the court may not have otherwise done so.

     g.     In a state court sworn affidavit dated March 11, 2014, (efiled March 11, 2014),  Webster attested to a purported transfer of beneficial interest ten years earlier, on or around April 7, 2004, but failed to include admissible evidence in support thereof.

     h.     From August 13, 2013, and continuing up to January 11, 2016, when the state court foreclosure action was withdrawn, Chase, through counsel HLJ, made repeated efile representations as if counsel for MERS and Webster when in fact HLJ was not.

     178.     Other known victims of defendants' and nondefendants' scheme are a matter of public record.  The defendants and nondefendants, acting individually and as part of the enterprise, used the mails and wires and have caused the mails and wires to be used, or reasonably knew the mails and wires would be used, in furtherance of their

fraudulent scheme .  Specifically;

      a.      In *Twin Oaks Condominium Association, Inc., v. Jones,* 30 A.3d 7, at 10,

132 Conn.App. 8 (2011),  Imagineers, the management company for Twin Oaks,

conducted and participated in the conduct of the enterprise by rejecting Jones'

payments of his common charges.  When more than six months passed and with the

accumulation of late fees, legal fees and other costs,  Imagineers, directly or indirectly,

triggered or cause to be triggered Fannie Mae Form 3140 Paragraph F.  Once

Paragraph F was activated, Jones' mortgagor, CitiMortgage, Inc., paid from Jones'

equity, more than $21,000 which was allocated among Twin Oaks, Imagineers, their

attorneys and anyone else who participated in the enterprise. Twin Oaks then withdrew

its foreclosure action.  After payment by CitiMortgage, Inc., *"...the defendant's*

*mortgage balance was increased from approximately $21,000 to $42,000." Id* at n.4;

      (b).     In *Jonas v. Delallo, et al,* FBTCV105029297S, Conn. Super. Ct., (filed

August 8, 2010), ZNC and Pacelli conducted and participated in the conduct of the

enterprise by rejecting Jonas' common charge payments. When more than six months

passed and with the accumulation of late fees, legal fees and other costs, Pacelli

triggered or caused to be triggered, directly or indirectly, Paragraph F.  Once

Paragraph F was activated, Jonas mortgagor, JP Morgan Chase readily paid Pacelli

thousands of dollars which was allocated among the condominium association, Pacelli

and anyone else who participated in the enterprise.  Pacelli then withdrew his

foreclosure action.  After payment by Chase, Jonas mortgage balance increased

proportionately;

c.      Between April 13, 2011, and June 16, 2015, the Office of the Comptroller

of the Currency (OCC), an agency of the United States Department of the Treasury,

issued eight cease and desist orders citing unsafe and unsound mortgage servicing

practices.  Total fines assessed by the OCC against Chase during this period total

$1,162,000,000 [12];

d.      There are numerous other victims of the defendants' and nondefendants'

enterprise scheme.  However, in cases where a withdrawal is filed prior to final

judgment, the state court, pursuant to Practice Book § 7-10 [13], destroys all records

upon the expiration of one year.  Thus, no judicial record of the countless victims and

the enterprise's fraudulent scheme remains.

179.    The defendants, acting individually and as part of the enterprise, have

used the mails and wires and have caused the mails and wires to be used, or

reasonably knew the mails and wires would be used, in furtherance of their fraudulent

scheme and have aided and abetted each other in furtherance of their scheme as

specifically identified in ¶¶ 166 through 178.

180.    Defendants have used the mails and wires on hundred of other occasions

which plaintiff cannot identify at this time but are known to defendants.  Each use of the

mails and wires has furthered the fraudulent scheme and enabled defendants to take

---

[12]  OCC enforcement actions, *http://apps.occ.gov/EASearch*
[13]  P.B. 7-10 provides in relevant part, "The files in all civil... claims, which, before a
final judgment has been rendered on the issues, have been terminated by the filing
of a withdrawal or by a judgment of dismissal or nonsuit when the issues have not
been resolved on the merits or upon motion by any party or the court, or in which
judgment for money damages only has been rendered and a full satisfaction of such
judgment has been filed, may be destroyed upon the expiration of one year after
such termination or rendition of such judgment."

money and property from plaintiff and other not yet identified victims by means of false pretenses and representations.

181. On information and belief, each and every defendant has specific knowledge the mails and wires are being utilized in furtherance of the overall purpose of executing the scheme to defraud, and/or it was reasonably foreseeable the mails and wires would be used because federal rules of civil practice and other governing statutes make use of the mails and wires mandatory. Indeed, no part of the defendant's scheme is possible without frequent and continual use of the mails and wires.

182. Each of the hundreds, if not thousands, of uses of the mails and wires in connection with defendants' schemes to defraud, spanning a period of no fewer than four years, constitutes a separate instance of mail and/or wire fraud within the meaning of 18 USC §§ 1341 and 1343, and thus, is also a predicate act which taken together constitute, "a pattern of racketeering activity," within the meaning of 18 USC §§ 1961 and 1962.

183. In connection with defendants' schemes, the acts of racketeering activity have occurred after the effective date of the RICO statute, 18 USC § 1961 *et seq.*, and on countless occasions over a substantial time period within ten years of each other. The acts of racketeering are an ongoing part of defendants' regular way of doing business. The predicate acts have been and will be repeated over and over again.

**Relationship of pattern of racketeering activity to enterprise.**

184. As described, the goal of defendants' enterprise is to secure foreclosure judgments on individual condominium properties through fraudulent means and to use

47

those judgments to extract money from unit owners through their equity interest thereby depriving the owners of their equity assets.

185.    The pattern of racketeering activity described above is integral to defendants' scheme.  Without engaging in mail and wire fraud, defendants would be unable to obtain the judgments they seek.

186.    Each defendant, individually and as a member of the enterprise, has conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through the pattern of racketeering activity described above.  Accordingly, each defendant has violated 18 USC § 1962(c).

187.    Moreover, each defendant, has knowingly agreed and conspired to violate the provisions of 18 USC § 1962(c), including the numerous predicate acts of mail and wire fraud described above, and has thus violated 18 USC § 1962(d).

188.    As a direct and proximate result of the RICO violations described in this Complaint, plaintiff and other unnamed victims have suffered substantial injuries. Plaintiff has been deprived of due process and has had civil actions, including foreclosure unsupported by the evidence of the record, filed against her, for the sole purpose of activating Fannie Mae's Form 3140 Paragraph F.  And irrespective of the state court foreclosure action withdrawal, Chase continues to demand payment on a debt Chase fabricated and for which Chase lacks authority of the holder and/or owner of plaintiff note to do.  Webster and MERS continue in their refusal to substantiate with admissible evidence their purported transfer of beneficial interest.  Fannie Mae continues to inflict violations of due process  through the use of unconscionable Form 3140.  The fraudulent activities of the defendants have caused plaintiff to incur a lis

48

pendens filed on the land records in the town of Stratford, Connecticut, extensive court fees, attorneys fees, and prolonged damage to her credit rating, all of which constitute an injury to plaintiff's property within the meaning of 18 USC § 1964, by the actions of defendants and their co-conspirators in violation of 18 USC § 1962(c) and (d).

189.    The defendants' misrepresentations to the courts to secure foreclosure judgment has caused concrete injury to plaintiff's property.  As a result, plaintiff has suffered damage to her property within the meaning of 18 USC § 1964, by the actions of defendants and their co-conspirators in violation of 18 USC § 1962(c) and (d).

190.    Defendants' conduct has involved and continues to pose a threat of long-term criminality since it is believed to have commenced as long as a decade ago when the 2007-9 mortgage crisis occurred and has escalated ever since.  The pattern of racketeering activity has been directed towards hundreds of persons, all unit owners, including plaintiff, and the pattern has spanned many years.

191.    For the violations of 18 USC § 1962 described in this Complaint, plaintiff is entitled to recover compensatory and treble damages under 18 USC § 1964(c). Pursuant to 18 USC § 1694(a), this court has the authority to restrain and enjoin further violations of 18 USC § 1692.  The pattern of racketeering activity is extended over a substantial period of time and is continuing, warranting injunctive relief.

**WHEREFORE**, plaintiff requests the Court to grant judgment in her favor and;

1.      compensatory damages;

2.      attorneys' fees;

3.      costs and expenses;

4.      punitive damages as to Counts Five, Thirteen and Sixteen;

5.      injunctive relief and treble damages at to Count Nineteen for each

violation of 18 USC § 1964(c) and;

6.      such other and further relief as this Court may deem proper.

Plaintiff hereby demands trial by jury pursuant to Rule 38(b) of the Federal Rules

of Civil Procedure.

PLAINTIFF

Dorothy A Smulley, self-represented
408 Bar Harbour Road
Stratford CT 06614
tel/fax   203 386 0171
email    frrancesca04@gmail.com

## CERTIFICATION

I certify on August 1, 2014, a copy of the motion for transfer of subpoenas was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicted on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

Dorothy A Smulley

# EXHIBITS

# CONDOMINIUM RIDER

THIS CONDOMINIUM RIDER is made this _____ day of _____, _____, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to _____ _____ (the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

_____

[Property Address]

The Property includes a unit in, together with an undivided interest in the common elements of, a condominium project known as:

_____

[Name of Condominium Project]

(the "Condominium Project"). If the owners association or other entity which acts for the Condominium Project (the "Owners Association") holds title to property for the benefit or use of its members or shareholders, the Property also includes Borrower's interest in the Owners Association and the uses, proceeds and benefits of Borrower's interest.

**CONDOMINIUM COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. Condominium Obligations.** Borrower shall perform all of Borrower's obligations under the Condominium Project's Constituent Documents. The "Constituent Documents" are the: (i) Declaration or any other document which creates the Condominium Project; (ii) by-laws; (iii) code of regulations; and (iv) other equivalent documents. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy on the Condominium Project which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, from which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, whether to the unit or to common elements, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender for application to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property, whether of the unit or of the common elements, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the Condominium Project, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the Constituent Documents if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay condominium dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest



from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Condominium Rider.

_____(Seal)
-Borrower

_____(Seal)
-Borrower

